UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------X
LG CAPITAL FUNDING, LLC,

     *Plaintiff*,

                              **MEMORANDUM & ORDER**
-against-
                              16-CV-2752(KAM)(JO)
5BARZ INTERNATIONAL, INC.,

     *Defendant*.
--------------------------------X

**MATSUMOTO, United States District Judge:**

         Plaintiff LG Capital Funding, LLC ("plaintiff"), a New York corporation with its principal place of business in Brooklyn, New York, commenced the instant action on May 31, 2016 by filing, together with certain other documents, a verified complaint ("Compl." or the "complaint," ECF No. 1) in this court against 5Barz International, Inc. ("defendant"), a Nevada corporation with its principal place of business in San Diego, California. The complaint alleges that defendant failed to abide by the terms of a certain convertible note issued by defendant to plaintiff, and seeks injunctive relief, damages of not less than one hundred thousand dollars, and an award of costs, expenses, and reasonable attorneys' fees. (*See generally* Compl.)

         Presently before the court is plaintiff's motion for summary judgment as to liability and damages on the complaint's second, fifth, and sixth claims for relief. Defendant opposes

the motion, and has submitted what defendant refers to as an opposition and cross-motion for summary judgment as to damages.

For the reasons set forth below, the court denies in its entirety plaintiff's motion for summary judgment as to claim five, which seeks recovery for defendant's breach of contract on a conversion theory, as conversion is not the appropriate cause of action on the facts here. Additionally, the court grants plaintiff's motion as to liability with respect to claim two, which seeks recovery on a breach of contract theory, and claim six, which seeks an award of attorneys' fees pursuant to a contractual provision. Further, the court denies plaintiff's motion without prejudice as to damages on claim two, and as to an award of, as opposed to a finding of liability for, attorneys' fees. Finally, to the extent defendant's opposition constitutes a cross-motion, the court denies it in its entirety.

## JURISDICTION AND VENUE

Plaintiff and defendant are diverse and, because the complaint seeks damages in the amount of "not less than" $100,000 with respect to its second and fifth claims for relief, (Compl. at 12), the amount in controversy exceeds $75,000. The court therefore has diversity jurisdiction over the instant action pursuant to 28 U.S.C. § 1332(a)(2). *See Scherer v. Equitable Life Assurance Soc'y of U.S.*, 347 F.3d 394, 397 (2d Cir. 2003) ("[W]e recognize 'a rebuttable presumption that the

face of the complaint is a good faith representation of the actual amount in controversy.'" (quoting *Wolde–Meskel v. Vocational Instruction Project Cmty. Servs., Inc.*, 166 F.3d 59, 63 (2d Cir. 1999))).  Venue is proper in this district pursuant to 28 U.S.C § 1391(b)(2) because a substantial part of the events and omissions giving rise to plaintiff's claims in the instant dispute occurred in this district.

**BACKGROUND**

**I.    Factual Background**

The following facts are taken from the parties' Local Civil Rule 56.1 statements of undisputed material facts, as well as documents submitted in connection with the instant motion, including those incorporated by reference into the parties' summary judgment papers, as applicable.  The court notes that defendant's Local Civil Rule 56.1 statement in opposition to plaintiff's motion and in support of defendant's cross-motion includes a number of denials, partial denials, and qualifications that are not supported by any citation to admissible evidence.  The court does not endeavor to note each of defendant's unsupported denials, and instead summarizes the material facts that are supported by admissible evidence and are not genuinely in dispute.

**A.   The Note**

On June 16, 2015, pursuant to a Securities Purchase Agreement by and between plaintiff and defendant, (the "SPA," Lerman Declaration in Support of Plaintiff's Motion for Summary Judgment ("Lerman MSJ Decl."), ECF No. 47-2, Ex L, ECF No. 47-4), defendant issued a Convertible Redeemable Note, (the "Note," Lerman Declaration in Support of Plaintiff's Application for Preliminary Injunctive Relief ("Lerman PI Decl."), ECF No. 2-5, Ex. A, ECF No. 2-6),[1] in the principal amount of $52,500, with interest accruing at 8% *per annum*.  (PSMF ¶ 5; DSMF ¶ 5.)[2]  On June 18, 2015, plaintiff funded the Note in an amount of $50,000, representing the Note's principal less $2,500 in defendant's attorneys' fees.  (PSMF ¶ 6, DSMF ¶ 6.)  The Note is governed by New York law, (Note § 14), and includes a conversion feature entitling its holder to, "at its option, at any time," convert "any amount of the principal face amount then outstanding," as well as "[a]ccrued but unpaid interest," into defendant's common stock.  (Note § 4(a).)

The Note provides that if its holder wishes to exercise its conversion right, it must comply with the requirements set forth in section 4(a) of the Note and provide

---

[1]    The Note is also in the record before the court as Exhibit A to the complaint.  (ECF No. 1-1.)
[2]    The court notes that, due to an apparent typographical error, the Note itself states that it is dated as of "June 16, 2016," but the parties agree that the Note was actually issued as of June 16, 2015.

"the Company," *i.e.*, defendant, with "written confirmation that

th[e] Note is being converted ([a] 'Notice of Conversion') in

the form annexed [to the Note] as Exhibit A."  (Note § 3.)

Exhibit A to the Note, in turn, consists of a form of Notice of

Conversion (the "Form of Notice"), which, in addition to

indicating the information that the Note's holder must convey to

convert debt under the Note to shares, states that it is "To be

Executed by the Registered Holder [*i.e.*, LG Capital] in order to

Convert the Note."  The Note further provides that "[t]he date

of receipt (including receipt by telecopy) of such Notice of

Conversion shall be the Conversion Date."  (Note § 3.)  Although

the Note itself does not include a separate, specific provision

governing how notices may be given, section 5(f) of the SPA

provides that

> [a]ny notice or other communication required or
> permitted to be given hereunder shall be deemed
> effective (a) upon hand delivery or delivery by
> facsimile, with accurate confirmation generated
> by the transmitting facsimile machine, at the
> address or number designated below . . . or
> delivery via electronic mail, or the first
> business day following such delivery (if
> delivered other than on a business day during
> normal business hours . . .) or (b) on the second
> business day following the date of mailing by
> express courier service . . . or upon actual
> receipt of such mailing, whichever shall first
> occur.

The SPA then sets forth specific physical addresses

for the parties to receive notice, and, in relevant part, states

that notices to defendant should be sent to the attention of

"Daniel Bland, CEO," and notices to plaintiff should be sent to

the attention of "Joseph Lerman, Manager." (SPA § 5(f).)

Also relevant to the instant action, the Note sets

forth a formula for determining the price of defendant's common

stock for purposes of conversion. Specifically, it provides

that the conversion price will be

> equal to 60% of the lowest trading price of the
> Common Stock as reported on the National
> Quotations Bureau OTCQB exchange [on] which
> [defendant's] shares are traded or any exchange
> upon which the Common Stock may be traded in the
> future . . . with a floor of $0.00001 per share,
> for the fifteen prior trading days including the
> day upon which a Notice of Conversion is received
> by [defendant] or its transfer agent (provided
> such Notice of Conversion is delivered by fax or
> other electronic method of communication to the
> Company or its transfer agent after 4 P.M.
> Eastern Standard or Daylight Savings Time if the
> Holder wishes to include the same day closing
> price).

(Note § 4(a) (emphasis omitted).)[3]

Section 12 of the Note requires that defendant create

a share reserve by "issu[ing] irrevocable transfer agent

instructions reserving 3,684,000 shares of its Common Stock for

conversions under th[e] Note." It also provides that defendant

"should at all times reserve a minimum of four times the amount

---

[3]     The Note also provides that if defendant "experiences a DTC 'Chill' on
its shares, the conversion price shall be decreased to 50% instead of 60%
while that Chill is in effect," (Note § 4(a) (emphasis omitted)), but that
provision is inapplicable here.

of shares required if the note would be fully converted," and that the reserve "shall be replenished as needed to allow for conversions of th[e] Note using said 4x reserve."  (Note § 12.)

The Note further provides that, upon delivery of a Notice of Conversion, "[i]f the shares have not been delivered within 3 business days, the Notice of Conversion may be rescinded." (Note § 4(a).)  Additionally, defendant's failure to deliver common stock "without restrictive legend within 3 business days of its receipt of a Notice of Conversion" to the Note's holder pursuant to the Note's conversion provisions constitutes an event of default.  (Note § 8(k).)  Other events of default set forth in the Note include defendant's failure to perform or observe any "covenant, term, provision, condition, agreement, or obligation under th[e] Note," (Note § 8(c)), and failure by the defendant to remain "'current' in its filings with the Securities and Exchange Commission."  (Note § 8(m).)

The Note provides that unless a default is cured within five days or "waived in writing by the Holder," the holder may accelerate the Note's maturity, that is, "consider th[e] Note immediately due and payable."  (Note § 8.)  Further, the Note provides for a default interest rate of "24% *per annum* or, if such rate is usurious or not permitted by current law, . . . the highest rate of interest permitted by law" upon an event of default.  (Note § 8.)

Section 8 of the Note also sets forth certain "penalt[ies]" for breaches of specific sections. For instance, the "penalty" for a "breach of [s]ection 8(k)," which requires that defendant deliver common stock within three days of defendant's receipt of a Notice of Conversion, is $250 per day that the shares are not issued beginning on the fourth day after issuance of the conversion notice, and $500 per day beginning on the tenth day. (Note § 8.)

Further, the Note provides for a cash payment to its holder by defendant in the event defendant "fails for any reason to deliver the Holder the conversion shares by the 3rd business day following the delivery of a Notice of Conversion to [defendant]." (Note § 8.) Specifically, should defendant fail to deliver shares by the third business day after receiving a Notice of Conversion, a "Failure to Deliver Loss" is to be calculated by multiplying the "[h]igh trade price at any time on or after the day of exercise" by the "[n]umber of conversion shares." (Note § 8.) The holder may elect to demand cash payment in the amount of the Failure to Deliver Loss by "provid[ing] [defendant] written notice indicating the amounts payable to the Holder in respect of the Failure to Deliver Loss." (Note § 8.) Should the holder so elect, defendant must "make the Holder whole" by paying the Failure to Deliver Loss in cash. (Note § 8.)

Finally, the Note provides that defendant shall reimburse the Note's holder "for its attorneys' fees and other costs and expenses incurred in the investigation, preparation and prosecution" of any "action or proceeding to enforce any provisions of th[e] Note," should the holder prevail in such an action. (Note § 8; *see also* Note § 7 ("The Company agrees to pay all costs and expenses, including reasonable attorneys' fees and expenses, which may be incurred by the holder in collecting any amount due under this Note.").)

B.   **The Instant Dispute**

Defendant became delinquent in its filings with the Securities and Exchange Commission ("SEC") on November 22, 2015.[4] (PSMF ¶ 17; DSMF ¶ 17.)  On March 14, 2016, defendant filed an SEC Form 10-Q for the period ending September 30, 2015 and thereby became current in its SEC filings. (PSMF ¶ 18; DSMF ¶ 18.)

The next day, March 15, 2016, plaintiff sent by e-mail a document styled as a "Notice of Conversion" (the "March Notice," Lerman PI Decl. Ex. C, ECF No. 2-8) to defendant

---

[4]   Defendant's delinquency in its SEC filings gave rise to an event of default under section 8(m) of the Note. (PSMF ¶¶ 42-43; DSMF ¶¶ 42-43.) Section 8 of the Note provides that, in the event a breach of section 8(m) "occurs or is continuing after the [six-]month anniversary of the Note," *i.e.* December 16, 2015, "the Holder shall be entitled to use the lowest closing bid price during the delinquency period as a base price for conversion." (Note § 8.)  However, plaintiff does not invoke section 8's conversion share price adjustment provision in connection with the instant action, and the court therefore need not determine whether or how it applies.

(specifically, to defendant's CEO, Daniel Bland) and to defendant's transfer agent (the "Transfer Agent"). (PSMF ¶¶ 19, 26.) Defendant admits that, with respect to the March Notice, plaintiff "purported to submit a Notice of Conversion" to "[defendant's] CEO" by e-mail, but, in sum and substance, denies that the March Notice was of any legal effect. (DSMF ¶¶ 19, 26.)

The March Notice contained several pieces of information that are also set forth in the Form of Notice annexed to the Note as Exhibit A, including the dollar amounts of principal and interest to be converted, the number of shares to be issued, the name of the borrower, the date of conversion, the applicable conversion price, plaintiff's EIN, the name in which the shares were to be registered, and the name of the account and account number to which the shares were to be sent. (PSMF ¶ 20; *compare* Form of Notice, Note, Ex. A *with* March Notice.) Additionally, the March Notice was executed by Gabe Sayegh and lists his title as a "Vice President" of plaintiff. (PSMF ¶ 21; March Notice.)

In the March Notice, plaintiff requested that defendant convert $7,500 in loan principal and $445.48 in accrued and unpaid interest of the note into 174,242 shares of defendant's common stock, representing a conversion price of $0.0456 per share. (PSMF ¶ 27; DSMF ¶ 27; March Notice.) On

April 27, 2016, an employee of defendant's Transfer Agent advised plaintiff in an e-mail that the Transfer Agent "d[id] not have a reserve in place to process conversions" and would "need authorization from [defendant] to issue shares from the treasury." (PSMF ¶ 29; Lerman PI Decl. Ex. D, ECF No. 2-9 (attaching e-mails); *see also* DSMF ¶ 29 (referring to language in Transfer Agent's e-mail).)

Defendant never honored the March Notice, (PSMF ¶ 28; DSMF ¶ 28), and on May 3, 2016, plaintiff rescinded the March Notice and executed and delivered a new Notice of Conversion (the "May Notice," Lerman PI Decl. Ex. F, ECF No. 2-11). (PSMF ¶¶ 34-35, 37; DSMF ¶¶ 34-35, 37.) The May Notice, like the March Notice, was executed by Mr. Sayegh, and plaintiff submitted it to defendant via Mr. Bland and the Transfer Agent.[5] (PSMF ¶¶ 36-37; *see* DSMF ¶¶ 36-37 (arguing that the May Notice was not valid but not disputing that plaintiff executed it and submitted it to defendant).) The May Notice requested that defendant convert all amounts outstanding under the Note, that is, $52,500 in principal and $4,809.86 in interest, into 1,699,580 shares of defendant's common stock at a conversion

---

[5]    Although not expressly stated by either party's Local Civil Rule 56.1 statement, it appears that plaintiff submitted the May Notice to defendant via e-mail. (*See* PSMF ¶ 37 (stating that plaintiff submitted May Notice to defendant and citing Lerman PI Decl. Ex. G, ECF No. 2-12); Lerman PI Decl. Ex. G (attaching emails); DSMF ¶ 37 (asserting that the May Notice "suffered the same defects as the [March Notice]" but not controverting assertion that the May Notice was delivered).)

price of $0.03372 per share. (PSMF ¶ 38; *see* DSMF ¶ 38 (arguing that the May Notice was not valid but not disputing its content).)

After submitting the May Notice, plaintiff once again received a notification from the Transfer Agent that there were not sufficient shares available to the Transfer Agent to fulfill the conversion request. (PSMF ¶ 39; DSMF ¶ 39.) The Transfer Agent explained that the shares were unavailable because no share reserve was in place and defendant had not executed irrevocable transfer agent instructions. (PSMF ¶ 39; DSMF ¶ 39.) To date, plaintiff has not received the shares. (PSMF ¶ 40; DSMF ¶ 40.)

Defendant has presented a supplemental declaration of Mark Geoghegan ("Geoghegan Supp. Decl.," ECF No. 49-1), defendant's director of finance, detailing, *inter alia*, his negotiations with plaintiff during the period that plaintiff served the March and May Notices of conversion. (Geoghegan Supp. Decl. ¶¶ 9-11.) The Geoghegan supplemental declaration is neither signed nor dated. (*See generally* Geoghegan Supp. Decl.) In it, Mr. Geoghegan states that "from the outset of the litigation," defendant offered to deliver conversion shares pursuant to the May Notice, but was rebuffed by plaintiff. (*Id.* ¶ 15.)

## II. **Procedural History**

Plaintiff commenced the instant action by filing a verified complaint on May 31, 2016, four weeks after submitting the May Notice. (*See generally* Compl.) Immediately after filing the complaint, plaintiff sought a preliminary injunction requiring, in relevant part, that defendant immediately provide fully executed irrevocable instructions to the Transfer Agent regarding the share reserve, and immediately deliver 1,699,580 shares of its common stock to plaintiff. (Plaintiff's Memorandum of Law in Support of Motion for Preliminary Relief, ECF No. 2-1, at 1.)

On July 7, 2016, the court held a hearing regarding plaintiff's motion for a preliminary injunction, which was ultimately held in abeyance pending settlement discussions between the parties. A settlement conference was held on July 28, 2016 but was not successful. (*See* Minute Entry, ECF No. 17.) Nevertheless, following the settlement conference, on August 1, 2016, the parties requested that plaintiff's motion for a preliminary injunction continue to be held in abeyance pending further settlement discussions. (Parties' Joint Letter, ECF No. 19.) The court continued to hold the preliminary injunction motion in abeyance until November 9, 2016, when the court deemed plaintiff's preliminary injunction motion withdrawn

in light of a joint status letter filed by the parties.  (*See* November 9, 2016 Docket Order.)

The court granted plaintiff leave to file the instant motion on February 27, 2017, and the motion was submitted to the court on May 1, 2017.  Through the instant motion, plaintiff seeks summary judgment on its second, fifth, and sixth claims for relief.  (*See* Plaintiff's Memorandum of Law ("Mem."), ECF No. 47-11, at 1, 18.)  Plaintiff's second and fifth claims relate to defendant's failure to deliver shares under the terms of the Note and seek damages for the failure to deliver "in an amount to be determined at trial but not less than one-hundred thousand dollars."  (Compl. ¶¶ 56-57, 71-72.)  The only difference between the complaint's second and fifth claims for relief is that the second claim is for breach of contract, and the fifth claim is styled as one for conversion.  (*See id.*)  The sixth claim for relief seeks an award of "costs and expenses, including reasonable attorneys' fees and expenses, incurred by [plaintiff] in collecting any amount under the Note."  (*Id.* ¶¶ 73-74.)

In addition to seeking a finding that defendant is liable to plaintiff for failure to perform its obligations under the Note, plaintiff seeks an award of damages at the summary judgment stage, and offers two alternative damages calculations for the court's consideration.  (Mem. at 9-10.)  The first of

these calculations is based on outstanding principal and interest due on the Note and the "penalty" for plaintiff's failure to deliver conversion shares as set forth in section 8 of the Note, which plaintiff characterizes as a liquidated damages provision, and results in a damages amount of $256,328.91. (*Id.* at 10-14.) The second of these calculations is based on the Note's "Failure to Deliver Loss/Make-Whole" provision and results in a damages amount of $203,949.60. (*Id.* at 14-16.)

Although plaintiff seeks summary judgment as to its entitlement to attorneys' fees, plaintiff does not, in its memorandum of law or otherwise, state the amount of attorneys' fees to which plaintiff believes it is entitled. (*See id.* at 16-18.) Additionally, plaintiff has not submitted any billing records or other relevant information regarding the amount of attorneys' fees that plaintiff seeks.

Defendant opposes plaintiff's motion and seeks summary judgment limiting plaintiff's recovery, if any, to delivery of 1,699,580 shares of common stock in defendant under the May Notice. (Defendant's Memorandum of Law ("Opp."), ECF No. 49-5, at 2.)

## LEGAL STANDARD

Federal Rule of Civil Procedure ("Rule") 56 provides that "[t]he court shall grant summary judgment if the movant

shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a).

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is material if it "might affect the outcome of the suit under the governing law," and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Further, no genuine issue of material fact exists "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted).

The moving party has the burden of establishing the absence of a genuine dispute as to any material fact, and in opposing summary judgment, the nonmoving party "need only present evidence from which a jury might return a verdict in his favor" to defeat a motion for summary judgment. *Id.* at 256-57. To meet this burden, however, a party opposing summary judgment must show "specific facts showing that there is a *genuine issue*

*for trial*," not merely "that there is some metaphysical doubt as to the material facts." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (emphasis in original) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). The nonmoving party may not rest only on the pleadings, and "[e]ach statement of material fact by the movant or opponent must be followed by citation to evidence which would be admissible, as required by [Rule] 56(e) and Local Civil Rule 56.1(d)." *Mich & Mich. TGR, Inc. v. Brazabra Corp.*, 128 F. Supp. 3d 621, 630 (E.D.N.Y. 2015). Nor may a defendant opposing summary judgment rely on "ultimate or conclusory facts and conclusions of law." *BellSouth Telecommunications, Inc. v. W.R. Grace & Co.-Conn.*, 77 F.3d 603, 615 (2d Cir. 1996) (citation omitted). "[C]onclusory statements are insufficient to raise a triable issue of material fact." *Id.* Instead, because it is "not sufficient merely to assert a conclusion without supplying supporting facts or argument," a party opposing summary judgment must set forth "concrete particulars." *Id.* (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978)).

Consistent with the foregoing, where, as here, a party seeks summary judgment on its breach of contract claim, "the [c]ourt must determine both (1) that there are no genuine issues of material fact that a party engaged or failed to engage in certain conduct, and (2) that such acts or omissions

unambiguously breach the terms of the contract." *Kobrand Corp. v. Abadia Retuerta S.A.*, No. 12-CV-154(KBF), 2012 WL 5851139, at *5 (S.D.N.Y. Nov. 19, 2012).

## DISCUSSION

### I. Conversion

Plaintiff alleges a claim for conversion in the complaint's fifth cause of action. Under New York law, conversion is the "unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights." *Union Capital LLC v. Vape Holdings Inc.*, No. 16-CV-1343(RJS), 2017 WL 1406278, at *3 (S.D.N.Y. Mar. 31, 2017) (quoting *Vigilant Ins. Co. v. Hous. Auth.*, 660 N.E.2d 1121, 1126 (N.Y. 1995)). It is well settled that a "mere breach of contract" does not give rise to liability for conversion. *Id.* (quoting *MBL Life Assurance Corp. v. 555 Realty Co.*, 658 N.Y.S.2d 122, 124 (N.Y. App. Div. 1997)). Instead, "[f]or a conversion claim to succeed in the context of a dispute regarding contract, the breach of contract must result in some 'wrong' that is separately actionable." *Id.* (quoting *In re Refco Sec. Litig.*, 759 F. Supp. 2d 301, 332 (S.D.N.Y. 2010)).

Here, plaintiff's conversion claim is identical to its breach of contract claim. Plaintiff does not assert the existence of any independently actionable wrong, much less come forward with evidence establishing one. Plaintiff's conversion

18

claim is therefore insufficient to survive even a motion to dismiss for failure to state a claim upon which relief can be granted. *See id.* ("Since [plaintiff's] conversion claim is merely seeking enforcement of the bargain set forth in the Contracts, it must be dismissed as duplicative." (citation omitted)). Accordingly, plaintiff's motion for summary judgment as to its conversion claim is denied and the claim for conversion is dismissed as duplicative. *See*, *e.g.*, *id.*; *accord ESI Inc. v. Coastal Power Prod. Co.*, 995 F. Supp. 419, 433-35 (S.D.N.Y. 1998) (dismissing claim for conspiracy to breach duty of loyalty as duplicative of substantive breach of fiduciary duty claim).

## II. Breach of Contract and Attorneys' Fees - Liability

### A. Liability for Failure to Deliver Shares

The complaint's second claim for relief asserts that plaintiff failed to deliver shares upon receipt of a valid Notice of Conversion and seeks damages for that failure. (*See* Compl. ¶¶ 56-57.) The Note is a contract, and plaintiff's claim for failure to perform under it is a breach of contract claim. *See*, *e.g.*, *Amrusi v. Nwaukoni*, 65 N.Y.S.3d 62, 65 (N.Y. App. Div. 2017) ("Generally, a promissory note is enforceable under traditional principles of contract law." (citing *Shlang v. Inbar*, 52 N.Y.S.3d 724, 726 (N.Y. App. Div. 2017))).

"To establish a claim [for] breach of contract under New York law, a plaintiff must demonstrate '(i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages.'" *Zorbas v. U.S. Trust Co.*, 48 F. Supp. 3d 464, 474 (E.D.N.Y. 2014) (quoting *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 142 (2d Cir. 2011)).

Here, the parties do not dispute the existence of a contract, that defendant issued the Note, nor that that plaintiff funded it. (PSMF ¶¶ 5-6; DSMF ¶¶ 5-6.) There is therefore no dispute that the parties formed a contract, nor is there any dispute that plaintiff performed under the contract.

The parties also do not dispute that plaintiff delivered the March Notice and the May Notice to defendant, that the March and May Notices called for the delivery of shares, that defendant failed to deliver shares as set forth in the March and May Notices, or that plaintiff rescinded the March Notice. (PSMF ¶¶ 19, 26-28, 34-38, 40; DSMF ¶¶ 19, 26-28, 34-38, 40; *see also* March Notice; May Notice.) Therefore, if the March and May Notices were valid Notices of Conversion under the Note, the undisputed material facts will establish that plaintiff is entitled to summary judgment as to liability.

Defendant asserts that the March Notice and the May Notice were not valid Notices of Conversion for three reasons.

First, defendant argues that the March and May Notices did not conform to the Form of Notice. (Opp. at 7-8.) Second, defendant contends that the March and May Notices are invalid because they were sent to defendant's CEO, Mr. Bland, and not to Mark Geoghegan, "who was designated as [defendant's] representative to whom inquiries regarding issued shares should be addressed." (*Id.*) Third, defendant asserts that the March and May Notices were "not properly executed since they were not executed by the Registered Holder of the Note," based on defendant's contention that Mr. Joseph Lerman was plaintiff's "designated signatory" because the Securities Purchase Agreement indicates that notices to plaintiff should be sent to Mr. Lerman's attention. (*Id.*)

Additionally, defendant raises a civil usury defense in arguing that plaintiff's recovery should be limited to delivery of 1,699,580 shares of defendant's common stock, (*see id.* at 9-10 (citing N.Y. Gen. Oblig. Law § 5-501 and N.Y. Banking Law § 14-a(1)), but civil usury is in reality a defense to liability. *See Sabella v. Scantek Med., Inc.*, No. 08-CV-453(CM)(HBP), 2009 WL 3233703, at *28 (S.D.N.Y. Sept. 25, 2009) (noting that where civil usury is proven, "the remedy would be to void the loans" under N.Y. Gen. Oblig. Law § 5-511). The court therefore addresses defendant's civil usury defense with

defendant's other defenses to, and arguments regarding, liability, and concludes that all are baseless.

The court first addresses defendant's contention that the March and May Notices failed to comply with the Form of Notice as set forth in Exhibit A to the Note. Notably, defendant does not, anywhere in its papers, actually explain how the March and May Notices differ from the Form of Notice, much less why these differences suffice to render the March and May Notices ineffective. Defendant's opposition contends that Mr. Geoghegan "noted" in a declaration filed earlier in this action that the March and May notices were not compliant, (Opp. at 7), and that its statement of material facts "demonstrate[s]" that the notice was noncompliant. (*Id*. at 8.) However, a review of the relevant Geoghegan declaration reveals that it contains only a conclusory statement that the "conversion notices are not in the specific format required by Exhibit A to the Note." (Geoghegan Declaration in Opposition to Plaintiff's Application for Preliminary Injunctive Relief, ECF No. 13-1, ¶ 16.) Defendant's statement of material facts parrots Mr. Geoghegan's conclusory assertion and adds similar conclusory statements of its own, (*see* DSMF ¶¶ 20, 35), but is lacks any explanation of the substance or import of the purported differences.

Furthermore, plaintiff's statement of undisputed material facts sets forth in detail the required information

called for by the form Notice of Conversion and notes that this information is contained in the March and May Notices. (PSMF ¶ 20.) In response to plaintiff's showing, defendant's Local Civil Rule 56.1 statement offers argument regarding the course of dealings between plaintiff and defendant, and argument as to who may properly execute a Notice of Conversion on behalf of plaintiff. (DSMF ¶ 20.) After this digression, defendant's response incorporates images of the Form of Notice and the March Notice and states, in a conclusory manner, that the "notices are different and not all information is identical." (*Id.*)

In opposing summary judgment defendant relies entirely on conclusory statements that the March and May Notices are invalid, but fails to provide "concrete particulars," perhaps hoping that the court will scour the March and May Notices and find a triable issue of material fact. Defendant has failed in its obligation to submit evidence and legal arguments in opposition to plaintiff's properly submitted summary judgment motion. *See BellSouth Telecommunications*, 77 F.3d at 615 ("An adverse party may not rest upon mere conclusory allegations or denials. The party opposing the motion for summary judgment must set forth concrete particulars. It is not sufficient merely to assert a conclusion without supplying supporting arguments or facts." (internal quotation marks and citations omitted)).

Despite defendant's failure, the court has reviewed the March and May Notices, and finds that they comply with the Note's requirements.  There are two immaterial differences between the Form of Notice and the March and May Notices. First, the March and May Notices include a statement, not present in the Note's Form of Notice, that "[n]o fee will be charged to the Holder for any conversion, except for transfer taxes, if any."  (*Compare* March Notice and May Notice *with* Note Ex. A.)  Second, the March and May Notices request that defendant issue a certificate or certificates for the conversion shares in the name of plaintiff.[6]  (*Id.*)  Neither of these additions, however, is clearly contrary to the terms of the Note, nor does either detract from the overall import of the March and May Notices.  Moreover, defendant submits no explanation as to why the inclusion of the aforementioned language would invalidate what is otherwise clearly a valid Notice of Conversion that contains all of the information called

---

[6]    The court also notes that there are certain other non-material differences.  For instance, the March and May Notices request that defendant "Fedex" the conversion shares, although the corresponding portion of Form of Notice states that "[s]hares are to be sent or delivered to the following account."  The March and May Notice also state the principal and interest being converted, rather than aggregating the two into one total conversion amount, and indicate the principal balance remaining on the Note, which the Form of Notice does not call for.  Additionally, the Form of Notice has language that applies only where the "[s]hares are to be issued in the name of a person other than the undersigned," which is clearly not the case here. Even if defendant expressly argued that these differences render the March and May Notices ineffective, which defendant does not, the court would reject that argument, and does not address these discrepancies further.

for in the Form of Notice attached as Exhibit A to the Note. Thus, on the record before it, the court concludes that the March and May Notices complied with the form Notice of Conversion and were submitted to defendant in the proper form.

Next, the court finds that the March and May Notices were properly executed and delivered to defendant. The Form of Notice attached as Exhibit A to the Note indicates that it is to be "[e]xecuted by the Registered Holder in order to [c]onvert the Note," and there is no dispute that plaintiff is the registered holder. (*See* PSMF ¶ 5; DSMF ¶ 5 (both indicating that Note was issued to plaintiff).) Based on the March and May Notices themselves, there can be no dispute that Mr. Sayegh, a vice president of plaintiff, executed both. (*See* March Notice; May Notice.) Moreover, both the March Notice and the May Notice clearly stated Mr. Sayegh's title and indicated that he was executing the document on behalf of plaintiff. (*Id.*) Plaintiff has offered an uncontroverted statement that Mr. Sayegh had the authority to execute both documents. (PSMF ¶ 22; Lerman MSJ Decl., ECF No. 47-2, ¶ 4.)

In response, defendant asserts that it "has no information as to whether a Mr. Gabe Sayegh, VP of LG[,] executed the Notices of Conversion," and states that Mr. Sayegh "was unknown and remains unknown to [defendant]," and "all communications regarding the Note and any issued shares

25

thereunder were between [Ahron] Fraiman [on behalf of plaintiff] and Mr. Geoghegan." (DSMF ¶¶ 21-22.) Defendant's foregoing attempt to create an issue of fact regarding the validity of the March and May Notices must fail.

The March and May Notices clearly indicated Mr. Sayegh's power to act as an agent of plaintiff, which has at all relevant times been the Note's registered holder and which, as a corporate entity, can act only through agents. Defendant offers absolutely no basis to doubt Mr. Sayegh's authority other than the dubious assertion that he "was . . . and remains unknown" to defendant, even though plaintiff verified that Mr. Sayegh was authorized to execute both Notices of Conversion, (PSMF ¶¶ 21-22; Lerman MSJ Decl. ¶ 4), each of which defendant acknowledges it received.[7]

Defendant's contention that the Notices of Conversion were not properly executed because Mr. Lerman did not sign them is wholly without merit. Defendant's only basis for this contention is that Mr. Lerman was "the designated signatory for the Registered Holder" because the SPA designated Mr. Lerman as the person to whose attention notices under the SPA should be

---

[7]     The court also notes that correspondence referenced in the parties' motion papers includes both Mr. Fraiman and Mr. Sayegh, as well as defendant's representatives, and clearly indicates that Mr. Sayegh has an e-mail account associated with plaintiff. (*See, e.g.,* Lerman PI Decl. Ex. G, ECF No. 2-12.) Additionally, defendant's assertion that it had previously dealt with Mr. Fraiman is of no moment, as defendant submits no evidence that Mr. Fraiman was plaintiff's exclusive agent with respect to its conversion rights under the Note.

sent.  (Opp. at 7-8.)  Defendant's contention makes no sense:
the relevant portion of the SPA speaks to who should *receive*
notices under the SPA, not who may execute Notices of Conversion
under the Note.[8]

Turning to the delivery of the March and May Notices,
the court observes that the Note itself only requires that the
Note's holder "give [defendant] written confirmation that th[e]
Note is being converted in the form annexed [to the Note] as
Exhibit A," (Note § 3), and does not designate a specific person
as the proper recipient of the Notice.  The Note also clearly
contemplates that a Notice of Conversion may properly be
"delivered by fax or other electronic method of communication."
(Note § 4(a).)  The SPA's more robust and detailed notice
provision, also provides that notices must be in writing and
allows for delivery by e-mail.  (*See* SPA § 5(f).)  The SPA also
provides that notices to defendant shall be sent to the
attention of Mr. Bland, defendant's CEO, "or to such other
address as [defendant] shall have specified most recently by
written notice."  (*Id.*)

There is no dispute that plaintiff delivered the March
and May Notices by e-mail to Mr. Bland, defendant's CEO.  (PSMF
¶¶ 19, 26, 37; DSMF ¶¶ 19, 26, 37.)  Plaintiff, therefore,

---

[8]     Defendant's contention is also confusing in light of plaintiff's
suggestion that it doubts Mr. Sayegh's agency because defendant had
previously dealt with Mr. Fraiman.  (*See* PSMF ¶¶ 21-22; DSMF ¶¶ 21-22.)

properly delivered the Notice of Conversion under the terms of the Note and under the notice provisions of the SPA, to the extent those are applicable.

Defendant's contention that the March and May Notices should have been delivered to Mr. Geoghegan is wholly without merit. The sole basis for this contention is a single e-mail message that defendant's Transfer Agent sent Mr. Fraiman, an employee of plaintiff, stating that "[defendant] has instructed us to forward inquiries regarding its issued shares to [Mr.] Geoghegan."[9]  (Opp. at 7; *see also* Correspondence from Transfer Agent, Geoghegan Supp. Decl. Ex. B, ECF No. 49-3.)  This correspondence does not suffice to render the March and May Notices improperly delivered for at least three reasons.

First, the relevant correspondence between the Transfer Agent and Mr. Fraiman relates to "inquiries regarding [defendant's] issued shares," not to Notices of Conversion or any other notices under the Note or the SPA, and as such is irrelevant to the issues presently before the court.  Second, the correspondence is from a third party, not from defendant, and states only that defendant "has instructed [the Transfer Agent] to forward inquiries regarding its issued shares to [Mr.]

---

[9]    The court notes that defendant also asserts that its CEO was in India at the time he received the March Notice, and that the March Notice was "unexpected[] and contrary to pending discussions and negotiations between [the parties]," (DSMF ¶ 19), but does not explain why any of these contentions are relevant to the effectiveness of the March Notice.

Geoghean." (Correspondence from Transfer Agent.) The Transfer
Agent's e-mail thus states that defendant asked the Transfer
Agent to forward notices, not that the defendant gave the
Transfer Agent authority to act on defendant's behalf and alter
plaintiff's notice obligations under the Note and/or SPA.
Third, even if the correspondence from the Transfer Agent were
relevant to notice procedures under the Note or SPA, and even if
it were a communication properly made on behalf of defendant by
the third-party Transfer Agent, the message from the Transfer
Agent was not sent to plaintiff in accordance with the notice
procedures set forth in the SPA. Those procedures, in relevant
part, require that notices to plaintiff under the SPA be sent to
Mr. Lerman, but the Transfer Agent's correspondence was directed
to Mr. Fraiman. (*See* SPA § 5(f).)

On the undisputed record before the court, therefore,
plaintiff is entitled to a finding that the March and May
Notices were properly executed and delivered.

Turning to defendant's contention that the Note is
usurious, the court concludes that defendant's position is
without a basis in law. Defendant raises only civil usury, (*see*
Opp. at 9-10), which is a defense to liability. *See* N.Y. Gen.
Oblig. Law § 5-511. As a corporation, however, defendant is
statutorily barred from asserting a civil usury defense. *See*
N.Y. Gen. Oblig. Law § 5-521(1) ("No corporation shall hereafter

interpose the defense of usury in any action. The term

corporation, as used in this section, shall be construed to

include all associations, and joint-stock companies having any

of the powers and privileges of corporations not possessed by

individuals or partnerships.").

Further, although a corporate defendant may raise a

criminal usury defense, there can be no usury where a

transaction is not a loan. *Seidel v. 18 E. 17th St. Owners,*

*Inc.*, 598 N.E.2d 7, 11-12 (N.Y. 1992). Here, plaintiff seeks to

recover for defendant's failure to deliver shares upon receipt

of a valid Notice of Conversion.

The weight of authority indicates that once the holder

of a convertible note exercises conversion rights, the converted

portion of the loan takes on the character of equity, not debt,

and the transaction is thus no longer susceptible to a usury

defense. *See Union Capital*, 2017 WL 1406278, at *5 ("[A] usury

defense could no longer be applied against the loan once the

Note principal was converted into equity." (citations omitted));

*accord Beaufort Capital Partners LLC v. Oxysure Sys., Inc.*, No.

16-CV-5176(JPO), 2017 WL 913791, at *3 (S.D.N.Y. Mar. 7, 2017)

("[T]hough the initial transaction took the form of a loan, upon

conversion to equity, the loans likely have the character of an

equity investment, and are thus no longer vulnerable to a usury

defense." (citations omitted)); *cf. KBM World Wide, Inc. v.*

*Hangover Joe's Holding Corp.*, No. 15-CV-7254(SJF)(GRB)*,* 2017 WL 685606, at *4 (E.D.N.Y. Feb. 1, 2017) ("[G]iven that the shares could fluctuate in value, and the value realized would be paid by a buyer and not the defendants, it is difficult to imagine that the share price discounts contained in the agreement could reasonably be construed as interest, and how one would calculate the rate of such interest."), *report and recommendation adopted* 2017 WL 680418 (E.D.N.Y. Feb. 21, 2017)*.*[10]

Notably, the converted portion of the debt takes on the character of an equity investment even where a notice of conversion is properly submitted but is not honored. *See Union Capital*, 2017 WL 1406278, at *4-5 (rejecting usury defense to liability for breach of contract where party had failed to honor notice of conversion under convertible note).

Based on the foregoing, the court concludes that the March and May Notices were properly executed and delivered. Further, there is no dispute that defendant has not honored the notices, (PSMF ¶¶ 33, 40; DSMF ¶¶ 33, 40), and defendant's usury defense fails as a matter of law.

---

[10]   The court also notes that even if defendant were to successfully assert a criminal usury defense, plaintiff might nevertheless be entitled to a recovery. *See*, *e.g.*, *Hillair Capital Investments, L.P. v. Integrated Freight Corp.*, 963 F. Supp. 2d 336, 340 n.3 (S.D.N.Y. 2013) (noting that even where a borrower successfully asserts a criminal usury defense, a lender may be able to recover on an unjust enrichment theory).

The court grants plaintiff summary judgment as to defendant's liability for failure to deliver shares under the terms of the Note because Mr. Geoghegan's declaration is undated and unsigned and fails to raise an issue of fact as to whether defendant proffered the shares in response to the March and May Notices, prior to the commencement of litigation.

B.    **Liability for Attorneys' Fees**

The Note expressly provides that defendant "agrees to pay all costs and expenses, including reasonable attorneys' fees and expenses, which may be incurred by the Holder in collecting any amount due under this Note." (Note § 7.) Section 8 of the Note also provides for reimbursement for attorneys' fees in the event that the Note's holder "shall commence an action. . . to enforce any provisions of th[e] Note . . . [and] prevail[] in such action." (Note § 8.) Defendant appears to contend that attorneys' fees and expenses should be considered as part of the court's usury analysis, (Opp. at 10), but offers no basis for treating attorneys' fees and expenses, which clearly are not interest under the Note, as interest.[11] Defendant has failed to comply with the terms of the Note, plaintiff has commenced an

---

[11]    For the sake of clarity, the court notes that defendant raises a usury argument regarding plaintiff's request for an award of attorneys' fees incurred in connection with enforcing the terms of the Note pursuant to sections 7 and 8 of the Note.  Defendant does not contend that plaintiff's attorneys' fees that were initially paid in connection with the parties' entry into the SPA and Note transaction, and which account for the $2,500 difference between the face amount of the Note and the amount for which plaintiff funded the Note, were "disguised interest."

action to enforce the Note's provisions, and, because the court
has granted summary judgment as to plaintiff's second claim for
relief, plaintiff has prevailed in that action.  Plaintiff is
therefore entitled to, and the court grants, summary judgment as
to defendant's liability for reasonable attorneys' fees and
expenses.

### III. Remedies

Having established that defendant is liable to
plaintiff for failure to deliver shares under the terms of the
Note, the court turns to plaintiff's request for summary
judgment as to damages.

#### A.   Specific Performance

The court first addresses defendant's contention,
which defendant characterizes as a cross-motion for summary
judgment, that that plaintiff's recovery should be limited to
delivery of 1,699,580 shares of defendant's common stock.  (Opp.
at 9-10.)  The court notes that defendant has not submitted a
separate statement of undisputed material facts with supporting
evidence pursuant to Local Civil Rule 56.1 in support of its
purported cross-motion, and on this basis alone, the court
denies defendant's cross motion.  *See* Local Civil Rule 56.1(a)
(requiring a separate statement of undisputed material facts in
support of a motion for summary judgment); *Thomas v. Hsiao*, No.
12-CV-1128(ILG)(SMG), 2012 WL 5897412, at *1 (E.D.N.Y. Nov. 21,

2012) (denying summary judgment for failure to comply with Local
Civil Rule 56.1 and collecting cases); *see also Holtz v.
Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) ("A district
court has broad discretion to determine whether to overlook a
party's failure to comply with local court rules." (citations
omitted)), *abrogated on other grounds by Gross v. FBL Fin.
Servs.*, 557 U.S. 167 (2009).

Further, even if defendant's cross-motion were not
denied for failure to comply with Local Civil Rule 56.1, it
would fail on the merits. Defendant relies on the unsigned,
undated Geoghegan supplemental declaration to argue, in sum and
substance, that because defendant has "repeatedly offered to
deliver the 1,699,580 shares," which defendant contends would
"fully satisfy the principal amount under the Note," plaintiff
should not receive any further relief. (Opp. at 9-10.) The
basis for this contention is unclear. Defendant cites no
provision of the Note or SPA, or any legal authority, for the
proposition that the only relief to which plaintiff is entitled
is belated delivery of the shares.

Defendant's contention that the only available remedy
for failure to honor a valid Notice of Conversion is specific
performance finds no support in the terms of the Note or under

34

the law.[12]  The Note expressly authorizes the rescission of a

Notice of Conversion in the event of a failure to perform, (Note

§ 4(a)), in which case the defendant would remain liable for the

outstanding debt on the Note.

Moreover, as the court has concluded, a failure to

deliver shares in accordance with the terms of the Note is a

breach of the parties' contract.  "[T]he general rule for

measuring damages for breach of contract has long been settled.

It is the amount necessary to put the plaintiff in the same

economic position he would have been in had the defendant

fulfilled his contract."  *Indu Craft, Inc. v. Bank of Baroda*, 47

F.3d 490, 495 (2d Cir. 1995) (quoting *Adams v. Linblad Travel,

Inc.*, 730 F.2d 89, 92 (2d Cir. 1984)).  Defendant submits no

basis for its implicit contention that belated delivery of

1,699,580 shares of defendant's shares would put plaintiff in

the same position it would have been in had plaintiff timely

delivered the shares pursuant to the March or May Notice.

Accordingly, the court declines to limit plaintiff's recovery to

delivery of 1,699,580 shares.

---

[12]    Defendant's contention also appears to be in tension with its prior
arguments in this action.  Specifically, although defendant now contends that
money damages are not available to plaintiff, in opposing this preliminary
injunctive relief, defendant asserted that plaintiff "ha[d] not demonstrated
– and c[ould] not" demonstrate the inadequacy of money damages.  (Defendant's
Memorandum in Opposition to Preliminary Relief, ECF No. 13, at 4-5.)

**B.    Damages**

As noted above plaintiff's claimed remedy is not limited to delivery of shares.  Instead of specific performance to deliver the converted shares to plaintiff, plaintiff may instead recover actual damages.  The Second Circuit has provided guidance on actual damages: where a breach of contract "involves the deprivation of an item with a determinable market value, the market value at the time of the breach is the measure of damages."  *Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820, 825 (2d Cir. 1990) (citing *Simon v. Electrospace Corp.*, 269 N.E.2d 21, 26 (N.Y. 1971)).  Applying this principle, "[t]he damage award resulting from a breach of an agreement to purchase securities is the difference between the contract price and the fair market value of the asset at the time of breach, not the difference between the contract price and the value of the shares sometime subsequent to the breach."  *Id.* (citing *Aroneck v. Atkin*, 456 N.Y.S.2d 558, 559 (N.Y. App. Div. 1982)).

Rather than seek an award of actual damages, however, plaintiff seeks damages of either $256,328.91, consisting of "liquidated damages of $179,500.00 and the unpaid principal and interest of $76,818.91 due on the Note," or, in the alternative, $203,949.60 based on the "Failure to Deliver Loss/Make-Whole" provision of the Note.  (*See* Mem. at 9-16.)

### 1. *"Liquidated Damages"*

Plaintiff argues that if the shares are not delivered, the Note provides for "liquidated damages in the amount of $250.00 per day beginning on the fourth day after the [N]otice of [C]onversion was delivered," and that the liquidated "damages amount would escalate to $500.00 per day from the tenth day" following delivery of a Notice of Conversion. (Mem. at 10-11.) Plaintiff contends that the application of these provisions results in "liquidated damages of $179,500.00." (*Id.*) Additionally, plaintiff contends that it is entitled to "$76,818.91 in unpaid principal and interest due on the Note," (*id.* at 13-14), which figure includes both default interest and a 10% increase in principal for failure to pay the Note at maturity. (*Id.* at 12-14; *see also* Note § 8 (setting forth default interest and 10% principal increase provisions).)

"Under New York law, courts will uphold and enforce liquidated damages provisions where (1) actual damages are difficult to determine and (2) the amount of damages awarded pursuant to the clause is not clearly disproportionate to the potential loss." *Union Capital*, 2017 WL 1406278, at *7 (citing *U.S. Fidelity & Guar. Co. v. Braspetro Oil Servs. Co.*, 369 F.3d 34, 70-71 (2d Cir. 2004)). If a contractual provision that specifies damages does not satisfy one or both of these factors, the liquidated damages provision will be deemed an unenforceable

penalty.  *Id.* (citing *U.S. Fidelity & Guaranty*, 369 F.3d at 70-71 and *Rattigan v. Commodore Int'l Ltd.*, 739 F. Supp. 167, 169 (S.D.N.Y. 1990)).

As set forth above, the court has concluded that by delivering the May Notice, plaintiff validly converted all principal and interest due under the Note into a contractual entitlement to shares.  Although the Note entitles plaintiff to rescind this conversion in the event of defendant's failure to deliver (Note § 4(a)), plaintiff has not rescinded the May Notice.  Plaintiff, as holder of the note, no longer has a claim to any "unpaid principal and interest;" instead, plaintiff is entitled to delivery of shares, which gives rise to actual damages for defendant's failure to deliver.

Turning to the appropriate measure of damages, the court concludes that plaintiff's request for "liquidated damages" in the amount of $179,500.00 is based on a contractual provision that constitutes an unenforceable penalty.  Indeed, the Note itself expressly uses the word "penalty" to describe what plaintiff claims to be the "liquidated damages" daily payment provisions, upon which plaintiff seeks $179,500.00. (Note § 8 ("In the event of a breach of Section 8(k) the *penalty* shall be $250 per day the shares are not issued beginning on the 4th day after the conversion notice was delivered to the Company.  This *penalty* shall increase to $500 per day beginning

38

on the 10th day." (emphasis added)).)  Although it is not
material whether the parties style a contractual provision as a
liquidated damages provision or a penalty, a provision that
fixes an amount "plainly or grossly disproportionate to the
probable loss" will be deemed a penalty and "will not be
enforced."  *Truck Rent-A-Ctr., Inc. v. Puritan Farms 2nd, Inc.*,
361 N.E.2d 1015, 1018 (N.Y. 1977) (citations omitted).

        Plaintiff offers no explanation as to how a daily fee
of $250, escalating to $500 after the tenth day on which
defendant has failed to convert shares could bear a proportional
relation to plaintiff's probable loss arising from defendant's
failure to deliver conversion shares.  These daily fees have
resulted in "liquidated damages," or, as characterized in the
Note, penalties that are wildly disproportionate to actual
losses.[13]  Thus, liquidated damages are denied because they are
clearly disproportionate to the potential loss.  *See Union
Capital*, 2017 WL 1406278, at *7 (citing *U.S. Fidelity &
Guarantee*, 369 F.3d at 70-71).

---

[13]    To illustrate the disconnect between the daily penalties and actual
damages, had plaintiff issued a Notice of Conversion calling for the delivery
of a single share, a failure to honor that Notice of Conversion would result
in "penalties" of $1,000 as of the seventh business day after delivery of the
Notice of Conversion.  The record reflects that defendant's shares have not
traded at a price above fifteen cents at any time relevant to this action,
and such a penalty would be vastly disproportionate, particularly considering
that the failure to deliver loss would be no more than a few cents in the
aforementioned situation.  The converse situation is also conceivable: were a
Notice of Conversion to call for delivery of a large number of shares, and
were delivery to be delayed for a few days, the "penalties" might be nowhere
near plaintiff's actual loss.

Furthermore, plaintiff's actual damages are a function of conversion price, the market price for defendant's shares at the time of defendant's breach when it failed to deliver the shares, and the number of shares converted, all of which can easily be determined. Therefore, the ready availability of all information necessary to compute plaintiff's actual damages precludes application of the daily penalty provisions, because actual damages are not difficult to determine. Accordingly, this court, like other courts in this circuit, concludes that the daily penalty provisions are unenforceable, and damages thereunder are denied. *See Union Capital*, 2017 WL 1406728, at *7 (concluding that similar contractual provision constitutes unenforceable penalty); *LG Capital Funding, LLC v. Coroware, Inc.*, No. 16-CV-2266(AMD)(PK), 2017 WL 3973921, at *3 (E.D.N.Y. Sept. 8, 2017) (in case involving same plaintiff as here, concluding that identical contractual provision constitutes unenforceable penalty).

### 2. *"Failure to Deliver Loss/Make-Whole" Damages*

For the reasons explained below, the court finds that application of the "Failure to Deliver Loss/Make-Whole" provision would result in a disproportionate damages calculation, and is an unenforceable penalty. Application of the "Failure to Deliver Loss/Make-Whole" provision is inappropriate where, as here, plaintiff's actual damages are a

function of readily determinable information.  *See Union Capital*, 2017 WL 1406278, at *7 (concluding that "determining damages in the event of a failure to deliver converted shares was no more complicated or ephemeral than the method of calculating the conversion in the first place").

As set forth above, where a party breaches an agreement to deliver securities pursuant to a convertible note, "[t]he damage award resulting from a breach of an agreement to purchase securities is the difference between the contract price and the fair market value of the asset *at the time of the breach*, not the difference between the contract price and the value of the shares sometime subsequent to the breach."  *Sharma*, 916 F.2d at 825 (citing *Aroneck* 456 N.Y.S.2d at 559) (emphasis added); *Union Capital*, 2017 WL 1406278, at *7.

Plaintiff's actual damages would "rectify [plaintiff's] loss of its contractual 4[0]% discount rate." *Union Capital*, 2017 WL 1406278, at *7.  The "Failure to Deliver Loss/Make-Whole" provision, however, calculates damages by multiplying the number of conversion shares by the high market price of defendant's shares at "*any time* on or after the day of exercise" of conversion rights under the Note.  (Note § 8.) "The liquidated damages formula of the Note is thus designed to provide [plaintiff] with a guaranteed higher cash payout than a true make-whole measure, which would focus only on [plaintiff's]

loss as a result of [defendant's] failure to abide by the terms

of the bargain." *Union Capital*, 2017 WL 1406278, at *7; *accord*

*LG Capital Funding*, 2017 WL 3973921, at *3-5 (citation

omitted).[14]  The court therefore concludes that the "Failure to

Deliver Loss/Make-Whole" provision of the Note constitutes an

unenforceable penalty, and damages thereunder are denied.

### 3.  *Actual Damages*

Although the court has concluded that plaintiff's

actual damages are readily ascertainable, the court notes that

certain information necessary to the calculation does not appear

to be in the record before the court.  Specifically, plaintiff's

damages must be calculated based on the market price of

defendant's shares as of the date of the breach.  The Note

provides that the "conversion shall be effectuated by

[defendant] delivering the shares of Common Stock to the holder

within 3 business days of receipt by the Company of the Notice

of Conversion."  (Note § 4(a).)  The date of the breach is

---

[14]    Plaintiff cannot contend that this guaranteed higher payout accurately
reflects damages arising from plaintiff's inability to hold defendant's
shares and sell them on the market upon the shares' appreciation in value.
The proposition that plaintiff would have been able to time its sale of
shares to avail itself of the shares' high trading price at "any time" after
delivery of the Notice of Conversion is wholly speculative.  *See LG Capital
Funding*, 2017 WL 3973921, at *3 ("Judge Kuo rejected the plaintiff's proposed
lost profits calculation, finding that the plaintiff did not provide any
support for its assumption that it would have sold the stock when it was at
its highest price, as opposed to any other time.").

therefore May 9, 2016, the fourth business day after plaintiff delivered the May Notice.[15]

The court, however, lacks any information as to what the market price of defendant's shares was as of May 9, 2016, and thus cannot determine plaintiff's actual damages. Accordingly, plaintiff's motion for summary judgment as to breach of contract damages is denied, without prejudice to plaintiff's ability to supplement the record with the information necessary to calculate plaintiff's actual damages and renew its motion.[16]

### 4. Attorneys' Fees

Plaintiff also seeks an award of attorneys' fees, but does not specify the amount of the award it seeks. (*See* Mem. at 16-18.) The court has already determined defendant is liable for fees, but concludes that it lacks sufficient information to render such an award on the current record. The Note provides for payment of "*reasonable* attorneys' fees and expenses." (Note § 7.) In determining the reasonableness of fees incurred, the court must "bear in mind *all* of the case-specific variables that we and other courts have identified as relevant to the

---

[15] Plaintiff's actual damages are based on the May Notice, because, although the March Notice was valid, there is no dispute that plaintiff rescinded it. The rescission of the March Notice reinstated the debt under the Note, and plaintiff then converted this debt under the May Notice.
[16] For the avoidance of doubt, the court does not now decide whether or to what extent plaintiff is entitled to pre-judgment interest.

reasonableness of attorney's fees in setting a reasonable hourly rate." *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany & Albany Cty. Bd. of Elections*, 522 F.3d 182, 190 (2d Cir. 2008) (emphasis in original).

Here, for the court to determine the reasonableness of plaintiff's fee request, the court must know the amount of fees requested. Plaintiff must also submit, at a minimum, information regarding counsel's professional experience, as well as contemporaneous billing records, which must indicate the hourly rate billed and include information as to the work undertaken by counsel and the time spent on each task. *See, e.g., Union Capital LLC v. 5Barz International, Inc.*, No. 16-CV-6203(KPF), 2017 WL 1929556, at *2 (S.D.N.Y. May 9, 2017) (setting forth standard for determining reasonableness of attorneys' fees pursuant to contractual fee shifting provision).

None of the necessary information to determine a reasonable attorneys' fee is before the court. Although the court has granted summary judgment as to liability for attorneys' fees, the balance of plaintiff's motion for summary judgment as to attorneys' fees is denied for lack of record evidence to support a specific award of fees. This denial is without prejudice to plaintiff's ability to renew its motion for an award of attorneys' fees in a specific amount upon submission of proper documentation; however, plaintiff may not renew its

request for a fee award until after the court has determined the amount of damages to which plaintiff is entitled.

**CONCLUSION**

For the foregoing reasons, defendant's motion for summary judgment is DENIED in its entirety and plaintiff's motion for summary judgment is GRANTED in part and DENIED in part as follows:

(1) Plaintiff's motion for summary judgment as to the complaint's fifth claim, for conversion, is DENIED and that claim is dismissed as duplicative of plaintiff's breach of contract claim.

(2) Plaintiff's motion for summary judgment as to liability with respect to the complaint's second claim, for breach of contract, is GRANTED. Defendant is liable to plaintiff for its failure to perform under the Note, as well as for reasonable attorneys' fees.

(3) Plaintiff's motion for summary judgment as to damages for failure to perform under the Note is DENIED. This denial is without prejudice to plaintiff's ability to renew its motion upon supplementing the record with the information necessary to calculate its actual damages under New York law as set forth in this order.

(4) Plaintiff's motion for summary judgment is DENIED to the extent it seeks an open-ended and unsubstantiated award

of attorneys' fees.  This denial is without prejudice to plaintiff's ability to renew its motion, but only after the issue of damages is resolved, and upon supplementing the record with the information necessary to determine the reasonableness of fees sought as set forth in this order.

Within seven (7) days of entry of this order, the parties shall submit a joint letter (i) indicating what, if any, briefing will be necessary on the issue of damages and (ii) setting forth a proposed schedule for that briefing.

**SO ORDERED.**

Dated: Brooklyn, New York
       March 31, 2018

                          _____/s/_____
                          KIYO A. MATSUMOTO
                          United States District Judge
                          Eastern District of New York