```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
LG CAPITAL FUNDING, LLC,

        Plaintiff,
                                          MEMORANDUM & ORDER
-against-
                                          16-CV-2752(KAM)(JO)
5BARZ INTERNATIONAL, INC.,

        Defendant.
----------------------------------X
```
**MATSUMOTO, United States District Judge:**

As discussed more fully below, on March 31, 2018, the court issued a memorandum and order (the "March Order," ECF No. 52) granting in part and denying in part a motion for summary judgment (the "First Summary Judgment Motion," ECF No. 47) filed by plaintiff LG Capital Funding, LLC ("plaintiff"). The partial denial of the First Summary Judgment Motion was without prejudice to plaintiff's ability to supplement the record and renew its motion as to certain relief the court denied in ruling on the First Summary Judgment Motion. (*See* March Order at 45-46.)

Presently before the court is plaintiff's renewed, second motion for summary judgment (the "Second Summary Judgment Motion"), which seeks summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56 as to plaintiff's damages. (*See* Notice of Motion, ECF No. 59.) In support of the Second Summary Judgment Motion, plaintiff has submitted a memorandum of law

("Pl. Mem.," ECF No. 61), and a declaration of Joseph Lerman ("Lerman Decl.," ECF No. 60), which has one exhibit.  Defendant 5Barz International, Inc. ("defendant") has submitted a memorandum in opposition ("Def. Mem.," ECF No. 66), but did not submit a responding affidavit or other proof of a factual dispute.  The court adopts and incorporates its previous consideration of the parties' Local Rule 56.1 Statements of Material Fact.  (*See* March Order at 3-12.)

For the reasons set forth below, the court grants the Second Summary Judgment Motion.

## **JURISDICTION AND VENUE**

Plaintiff is a New York limited liability company, has its principal place of business in New York, and all of its members are New York citizens.  (Complaint, ECF No. 1, ¶ 1.) Defendant is a Nevada corporation with its principal place of business in California.  (*Id.* ¶ 2.)  Accordingly, plaintiff and defendant are diverse and, because the complaint sought damages in the amount of "not less than" $100,000 (*id.* at 12), the amount in controversy exceeds $75,000.  The court therefore has diversity jurisdiction over the instant action pursuant to 28 U.S.C. § 1332(a).  *See Scherer v. Equitable Life Assurance Soc'y of U.S.*, 347 F.3d 394, 397 (2d Cir. 2003) ("[W]e recognize 'a rebuttable presumption that the face of the complaint is a good faith representation of the actual amount in controversy.'"

(quoting *Wolde-Meskel v. Vocational Instruction Project Cmty. Servs., Inc.*, 166 F.3d 59, 63 (2d Cir. 1999))). Venue is proper in this district pursuant to 28 U.S.C § 1391(b)(2) because a substantial part of the events and omissions giving rise to plaintiff's claims in the instant dispute occurred in this district.

## BACKGROUND

The court assumes familiarity with the underlying facts, which are set forth more fully in the March Order. This Memorandum and Order addresses only those facts that are relevant to the Second Summary Judgment Motion.

**I. Relevant Facts and Procedural History**

As discussed in the March Order, defendant issued a Convertible Redeemable Note (the "Note") on June 16, 2015 in the principal amount of $52,500 with interest accruing at 8% *per annum*. (March Order at 4.) The Note provided that its holder (*i.e.*, plaintiff) was entitled to convert any amount outstanding under the Note, including principal and accrued but unpaid interest, into shares of defendant's common stock. (*Id.*) Additionally, the Note set forth certain terms and conditions applicable to the holder's right to convert debt, including requirements regarding the form and content of the requisite notice of conversion, a formula to determine the conversion price, and a three business day deadline for defendant to

3

deliver shares upon receipt of a valid conversion notice. (*See id.* at 4-7 (discussing relevant provisions of Note).)

On March 15, 2016, plaintiff executed and delivered to defendant a document styled as a "Notice of Conversion" (the "March Notice"), which purported to convert $7,500 in loan principal and $445.48 in accrued but unpaid interest into 174,242 shares of defendant's common stock, at a conversion price of $0.0456 per share. (*Id.* at 9-10.) Defendant never honored the March Notice, and on May 3, 2016, plaintiff rescinded the March Notice and executed and delivered a new "Notice of Conversion" (the "May Notice"). (*Id.* at 11.) The May Notice purported to convert all $57,309.86 outstanding under the Note, into 1,699,580 shares of defendant's common stock at a conversion price of $0.03372 per share as of the date of the May Notice. (*Id.* at 11-12.)[1] Defendant did not honor the May Notice. (*Id.* at 12.)

Plaintiff commenced this action on May 31, 2016, alleging, in relevant part, that defendant had failed to deliver shares of its common stock as required under the terms of the Note. (*See id.* at 1.) Plaintiff filed the First Summary Judgment Motion on May 1, 2017 (*id.* at 14), seeking, as relevant here, summary judgment that defendant had breached its

---

[1] The $57,309.86 consisted of $52,500 in principal and $4,809.86 in interest. (March Order at 11.)

4

contractual obligation to deliver shares of common stock, an award of damages for defendant's failure to deliver the shares, and an award of attorneys' fees based on contractual fee shifting provisions in the Note. (*Id.* at 14-15.)[2]

On March 31, 2018, the court entered the March Order, in which the court concluded that the March Notice and the May Notice were valid and effective notices of conversion under the Note and consequently the delivery of each Notice obligated defendant to deliver shares to plaintiff. (*Id.* at 19-32.) Because there was no dispute that defendant had not delivered to plaintiff any shares of its stock, the court concluded that defendant had breached its contractual obligations and granted the First Summary Judgment Motion as to defendant's liability for failure to deliver shares. (*Id.* at 31-32, 45.) The court also concluded that defendant must pay plaintiff's reasonable attorneys' fees under the terms of the Note. (*Id.* at 32-33.)

The court, however, rejected plaintiff's proposed damages calculations as both calculations plaintiff offered were based on unenforceable contractual provisions. (*Id.* at 36-42.) The court also concluded that, under applicable Second Circuit authority, the proper damages calculation is properly based in

---

[2] Plaintiff also sought summary judgment against defendant on a conversion theory, but the court denied this portion of the First Summary Judgment Motion and dismissed plaintiff's conversion claim as duplicative of its breach of contract claim. (March Order at 18-19.)

5

part on the market price for shares of common stock of defendant on May 9, 2016, the date defendant breached its contractual obligations. (*Id.* at 42-43.) Because the market price for shares of defendant's common stock on the date of the breach was not in the record, the court denied the First Summary Judgment Motion as to damages, without prejudice to plaintiff's ability to supplement the record and renew its motion. (*Id.* at 42-43, 45.)

The court also noted that plaintiff had not specified the amount of the attorneys' fee award that it sought, or submitted the supporting information necessary for the court to determine a reasonable attorneys' fee. (*Id.* at 43-45.) Consequently, the court denied plaintiff's motion as to attorneys' fees to the extent plaintiff sought any relief beyond a finding of liability; like the court's determination as to plaintiff's request for an award of damages for defendant's failure to deliver shares, this denial was without prejudice to plaintiff's ability to supplement the record and renew its motion. (*Id.* at 44-45.)

## II. Plaintiff's Second Motion for Summary Judgment

On April 19, 2018 the parties appeared for a status conference before the Honorable James Orenstein, United States Magistrate Judge. (*See* April 19, 2018 Minute Entry, ECF No. 58.) At this conference, Judge Orenstein granted defense

counsel's motion to withdraw as attorney based on defendant's "failure to pay her fee." (*Id.*) Judge Orenstein also set a briefing schedule for the instant motion pursuant to which plaintiff was to file its summary judgment motion as to damages by May 3, 2018 and defendant was to file its response by May 17, 2018. (*Id.*)

Plaintiff complied with Judge Orenstein's briefing schedule and filed the Second Summary Judgment Motion on May 3, 2018. (*See* Notice of Motion, ECF No. 59.) Defendant, however, did not file a response by the deadline Judge Orenstein set, and plaintiff requested that the Second Summary Judgment Motion be deemed submitted. (*See* Letter, ECF No. 62.) On July 16, 2018, the court entered a docket order affording defendant one final opportunity to respond to plaintiff's Second Summary Judgment Motion by July 30, 2018 (*see* July 16, 2018 Docket Order), and defendant filed its opposition on July 30, 2018. (*See generally* Def. Mem.)

## **LEGAL STANDARD**

Rule 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a).

As the court made clear in the March Order, the only fact material to damages that was not established through the

7

parties' submissions in connection with the First Summary Judgment Motion is the market price of defendant's shares as of May 9, 2016. (March Order at 42-43.)

**DISCUSSION**

In the Second Summary Judgment Motion, plaintiff seeks damages in the amount of $110,472.70, representing the market value of 1,699,580 shares of defendant's common stock as of May 9, 2016. (Pl. Mem. at 2-3, 5.) Plaintiff submits that this amount "can be broken down into $53,162.84 in lost profits . . . and $57,309.86" in principal and interest due under the Note. (*Id.* at 5.) Defendant, for its part, submitted no evidence to dispute plaintiff's factual showing in its Second Summary Judgment Motion. Instead, defendant asserts that plaintiff may only recover expectation/lost profit damages, or alternatively principal and interest under the Note, but not both. (Def. Mem. at 3-6.)

For the reasons set forth below, the court concludes that plaintiff is entitled to actual damages in the amount of $110,472.70, which represents the amount necessary to put plaintiff in the same position it would have occupied had defendant fulfilled its contractual obligations.

**I. General Damages Principles**

The Note, and consequently damages thereunder, are governed by New York law. (*See* March Order at 4 (citing Note §

8

14).) Under New York law, "[d]amages for breach of contract are intended to place a party in the same position he would have occupied if the breach had never occurred. They are not designed to create windfall recoveries." *Lucente v. Int'l Bus. Machines Corp.*, 146 F. Supp. 2d 298, 304 (S.D.N.Y. 2001) (citing *Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 495 (2d Cir. 1995); *Brushton-Moira Cent. School Dist. v. Fred H. Thomas Assocs., P.C.*, 692 N.E.2d 551, 553 (N.Y. 1998); and *Goodstein Corp. v. City of New York*, 604 N.E.2d 1356, 1360-62 (N.Y. 1992)).

Additionally, and as the court observed in the March Order (*see* March Order at 36), the Second Circuit has concluded that where a breach of contract "involves the deprivation of an item with determinable market value, the market value at the time of the breach is the measure of damages." *Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820, 825 (2d Cir. 1990) (citing *Simon v. Electrospace Corp.*, 269 N.E.2d 21, 26 (N.Y. 1971)).

**II. Application**

    **1. Contractual Terms**

Because "[c]ontract damages are ordinarily intended to give the injured party the benefit of the bargain by awarding a sum of money that will, to the extent possible, put that party in as good a position as it would have been in had the contract

9

been performed," *Goodstein Construction*, 604 N.E.2d at 1360, the court looks to the positions the parties would have occupied absent defendant's breach.

As discussed in the March Order, the Note's conversion feature allows its holder to convert sums outstanding under the Note into an entitlement to shares of defendant's common stock. (March Order at 4.) The conversion feature is conceptually akin to an option for the Note's holder to purchase shares of defendant's common stock using a dollar-for-dollar reduction of money owed under the Note, rather than cash, as consideration for the purchase. (*See id.* at 4-7 (discussing conversion feature).)

In the March Order, the court concluded that defendant breached its contractual obligation to deliver shares of its common stock upon a valid exercise of that option by plaintiff, the Note's holder. (March Order at 19-32.) Additionally, the court concluded that plaintiff validly rescinded the March Notice, and thus the May Notice is the operative Notice for purposes of determining damages. (March Order at 43 n.15.)

The May Notice "converted all principal and interest due under the Note" as of May 3, 2016, *i.e.*, an aggregate amount of $57,309.86, comprised of $52,500 in principal and $4,809.86 in interest, "into a contractual entitlement to shares" of defendant's stock at a conversion price of $0.03372 per share.

10

(March Order at 11-12, 38.)  In other words, by executing and delivering the May Notice, plaintiff converted amounts due under defendant's Note to an aggregate "purchase price" of $57,309.86 for defendant's shares in the form of a dollar-for-dollar reduction of defendant's debt under the Note, thereby reducing the principal and interest due under the Note to zero.  In return, plaintiff was to receive 1,699,580 shares of defendant's common stock.

2. **Plaintiff's Damages**

As discussed in the March Order, by operation of the Note's conversion provisions, defendant was to deliver the aforementioned 1,699,580 shares to plaintiff within three business days of its receipt of the May Notice but did not do so.  (March Order at 42-43.)  Thus, defendant was in breach of its obligations as of May 9, 2016, the fourth business day after plaintiff delivered the May Notice.  (*Id.*)

Further, defendant's breach of its contractual obligation was one that deprived plaintiff of "item[s] with determinable market value," *Sharma*, 916 F.2d at 825, specifically 1,699,580 shares of defendant's common stock.  Accordingly, the measure of damages is the fair market value of those shares on the date of defendant's breach, May 9, 2016.[3]

---

[3] The $0.03372 per share conversion price that plaintiff "paid" for each share of defendant's common stock was determined as of May 3, 2016, the date that plaintiff executed and delivered the May Notice to defendant, based on a

*See id.* The parties agree that the market price for defendant's shares on May 9, 2016 was $0.065 per share (Pl. Mem. at 4; Def. Mem. at 5; Lerman Decl. ¶¶ 9, 13), and consequently, the 1,699,580 shares to which plaintiff was entitled were worth an aggregate amount of $110,472.70.

### *i.  Defendant's Contentions*

Defendant, however, contends that an award of $110,472.70 would not be appropriate. Instead, according to defendant, plaintiff should only receive "$53,162, [which] equals the difference between the fair market price of [defendant's] stock on the date of the breach [of] contract ($0.065) and the contract price ($0.03372), multiplied by the number of shares the plaintiff sought to convert." (Def. Mem. at 5.)[4]

---

formula set forth in the Note. (*See* March Order at 6, 11-12.) The market price for the shares of defendant's common stock for purposes of determining damages, however, is determined as of May 9, 2016, the date of defendant's breach, when the market price was $0.065 per share.

[4] Defendant also argues, in the alternative, that damages should be limited to an award of principal and interest outstanding as of the date of defendant's breach. (Def. Mem. at 5-6.) This argument is premised on defendant's contention that, at the time defendant breached its obligation to deliver shares, the Note was not a security and consequently could not legally be converted into freely tradeable shares of defendant's common stock. (*See id.*) The Supreme Court has "held that while all 'notes' are presumed to be securities, that presumption is subject to rebuttal." *Intelligent Digital Sys., LLC v. Visual Mgmt. Sys., Inc.*, 683 F. Supp. 2d 278, 283 (E.D.N.Y. 2010) (citing *Reves v. Ernst & Young*, 494 U.S. 56, 62–63, 65 (1990)). In evaluating whether a party has rebutted this presumption, courts consider four factors: "(1) the motivations that would prompt a reasonable buyer and seller to enter into the transaction; (2) the plan of distribution of the instrument; (3) the reasonable expectation of the investing public, and (4) whether some factor, such as the existence of another regulatory scheme, significantly reduces the risk of the instrument, thereby rendering application of the securities laws unnecessary." *Id.* at 284 (citing *Reves*, 494 U.S. at 66-67). Here, defendant has not submitted any

12

In support of its proposed damages calculation, defendant advances two key contentions. First, defendant cites to *Union Capital LLC v. Vape Holdings Inc.*, No. 16-CV-1343(RJS), 2017 WL 1406278 (S.D.N.Y. Mar. 31, 2017), on which the court relied as persuasive authority in the March Order, for the proposition that "the damage award resulting from a breach of an agreement to purchase securities is the difference between the contract price and the fair market value of the asset at the time of the breach, not the difference between the contract price and the value of the shares sometime subsequent to the breach." 2017 WL 1406278, at *6 (quoting *Sharma*, 916 F.2d at 825). Based on this authority, plaintiff suggests that where a seller breaches a securities purchase contract, applicable authority imposes a categorical requirement that the contractual purchase price for the relevant securities be deducted from the market price in calculating damages. (Def. Mem. at 3-5.) Second, defendant asserts that "[p]laintiff's proposed calculation of damages in this action allows [p]laintiff to 'double dip' and be awarded nearly double the amount of damages tha[t] are due." (*Id.* at 4.) These contentions do not withstand scrutiny.

---

evidence to which the court can apply these factors, and, therefore, has not rebutted the presumption that the Note is a security. Accordingly, defendant's contention that the Note is not a security, and its argument regarding damages premised on that contention, fail.

13

Regarding defendant's first contention, the key principle for which the quoted language in *Union Capital* and the Second Circuit's *Sharma* decision stand is that under New York law, breach of contract damages are properly determined with reference to the time of the breach, not some subsequent period in time. In *Sharma*, which *Union Capital* quoted, the appellants argued that their adversary's "breaches of . . . various financing agreements prevented refinancing and caused appellants to lose" certain ships, which in turn "deprived appellants of assets that would have produced substantial profits . . . sometime in the future," and entitled appellants "to those profits as damages." *Sharma*, 916 F.2d at 825.

It was in rejecting this argument that the *Sharma* court observed, in relevant part, that the measure of damages where a party breaches a securities purchase agreement is "the difference between the contract price and the fair market value of the asset at the time of the breach, not the difference between the contract price and the value of the shares sometime subsequent to the breach." *Sharma*, 916 F.2d at 825 (citation omitted). Further establishing the import of the relevant passage in *Sharma*, the Second Circuit also observed that under New York law, "changes in currency exchange rates subsequent to a breach may not be taken into account in measuring damages," and that damages where a party breaches a real estate sale

14

contract are also determined with reference to the fair market value of the relevant real estate at the time of the breach. *Id.* (citations omitted).

Similarly, in *Union Capital*, the United States District Court for the Southern District of New York relied on *Sharma* in rejecting a request for specific performance and a proposed damages calculation that was based on the "high trading price" of the defendant's shares at any time after the *Union Capital* plaintiff delivered a notice of conversion to the defendant in that action. *See* 2017 WL 1409278, at *5-7. The March Order did much the same, as it relied on *Union Capital* and *Sharma* in rejecting plaintiff's request for an award of damages that was based on "the high market price of defendant's shares at any time on or after the day of exercise of conversion rights under the Note." (March Order at 41 (internal quotation marks, citations, and emphasis omitted).)

Additionally, in *Sharma*, the Second Circuit observed that "under New York law, if the contract in question were for the sale of vessels to appellants and the seller were to breach the contract, appellants' recovery would be limited to the value of the vessels on the date of the breach." 916 F.2d at 826. This formulation of damages principles makes no reference to any categorical requirement that, in calculating damages where a seller breaches a sale contract, the contractual purchase price

15

must be deducted from the fair market value of the assets to be purchased.  Further, nothing in *Sharma*, cases applying it, or the parties' papers here, provides any indication that there is a basis in law or economic reality to impose such a categorical requirement for securities purchase agreements, but not purchase agreements for other assets.

The foregoing makes clear that neither the Second Circuit's decision in *Sharma*, nor subsequent district court decisions relying on it, require that, in calculating damages where a seller breaches a contract to sell securities, the contract price must be deducted from the fair market value of the assets to be purchased in all cases and regardless of any other facts or considerations.

Instead, in stating that "[t]he damage award resulting from a breach of an agreement to purchase securities is the difference between the contract price and the fair market value of the asset at the time of breach," *Sharma*, 916 F.2d at 825 (citation omitted), the Second Circuit simply acknowledged that in at least some subset of cases, this calculation results in a measure of damages that puts the non-breaching party "in as good a position as it would have been in had the contract been performed." *Goodstein Construction*, 604 N.E.2d at 1360 (citation omitted).  A case in which a seller under a contract for the sale of securities that refuses to accept payment or

16

deliver the securities presents such a circumstance.  There, damages of fair market value minus contract price would put the buyer in the position it would have occupied had the contract been performed because the buyer *would have* paid the contract price and received securities with a readily determinable market value in return.

Here, however, and as discussed above and in the March Order, in executing and delivering the May Notice, plaintiff actually gave up an entitlement to $57,309.86 in principal and interest under the Note.  At the time of the breach, the only unfulfilled, non-contingent obligation under the Note was defendant's obligation to deliver 1,699,580 shares of its common stock, and had defendant fulfilled this obligation, plaintiff would have received shares in defendant worth $110,472.70 on the date of defendant's breach.  Deducting the $57,309.86 "contract price" would only make sense if, absent defendant's breach, plaintiff *would have*, but had not yet, given defendant value in the amount of $57,309.86.  Plaintiff, however, already gave this value by executing and delivering the May Notice and thereby converting its debt into an entitlement to shares of defendant's common stock.

Turning to defendant's second argument, the foregoing analysis makes clear that it is actually defendant that seeks improperly to "double dip," as defendant seeks to have plaintiff

treated as though it never gave up its entitlement to principal and interest under the Note in executing and delivering the May Notice, even though the court has already concluded that "plaintiff validly converted all principal and interest due under the Note into a contractual entitlement to shares." (March Order at 38.)

### ii. *Summary*

Accordingly, the court rejects defendant's contentions. To briefly recapitulate, as defendant notes, "[p]laintiff's only expectation was to receive the stock . . . , not to receive the stock in addition to repayment of the loan." (Def. Mem. at 3.) Plaintiff did not expect repayment, however, because by executing and delivering the May Notice, plaintiff effectively traded its entitlement to principal and interest for its entitlement to shares of defendant's common stock. Further, there is no basis to reduce plaintiff's damages by a sum that plaintiff would have paid defendant had the conversion transaction been consummated, as plaintiff had already performed all relevant obligations under the Note. Thus, plaintiff is entitled to damages of $110,472.70, the value at the time of defendant's breach of the shares of stock to which plaintiff was entitled.

As a final matter, defendant observes several times in opposing the Second Summary Judgment Motion that $110,472.70

represents an amount significantly larger than amount of principal and interest due under the Note at the time of defendant's breach. (*See* Def. Mem. at 3-6.) It bears mention that this result is precisely what the parties' contractual arrangement contemplates. The Note's conversion feature entitles the Note's holder to exchange its debt for an entitlement to receive equity. Making this exchange only makes sense if the equity is worth more than the debt, and had defendant performed under the Note, plaintiff would have in fact received shares with a market value greater than the remaining principal and interest due under the Note. Therefore, rather than "unjustly enrich[ing] [p]laintiff" (*id.* at 4), damages of $110,472.70 give plaintiff the benefit of its bargain.

## CONCLUSION

For the foregoing reasons, the Second Summary Judgment Motion is GRANTED, and the court concludes that plaintiff is entitled to damages in the amount of $110,472.70. Additionally, plaintiff may not recover any further on account of principal and interest previously due under the Note.

The only issue remaining in this action is the quantum of plaintiff's reasonable attorneys' fees, which plaintiff states "will be addressed upon resolution" of the Second Summary Judgment Motion. (Pl. Mem. at 5.) Plaintiff shall submit its application for attorneys' fees, contemporaneous time records,

19

and any other documentation in support thereof consistent with Second Circuit law within fourteen (14) days of the date of this order.

**SO ORDERED.**

Dated: Brooklyn, New York
      September 6, 2018

                                      _____/s/_____
                                      KIYO A. MATSUMOTO
                                      United States District Judge
                                        Eastern District of New York